**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| LINA SCURTU, *et al.*, | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| v. | )    **CIVIL ACTION 07-0410-WS-B** |
| | ) |
| HOSPITALITY AND CATERING | ) |
| MANAGEMENT SERVICES, *et al.*, | ) |
| | ) |
| **Defendants.** | ) |

**ORDER**

This matter, which has been stayed pending arbitration since October 2007, comes before the Court on dueling motions filed by the parties pursuant to an arbitration stalemate. These motions concern the same facts and circumstances, and differ only in the parties' proposed solutions to their dilemma. In particular, plaintiffs' Motion to Proceed with Claims in this Judicial Forum (doc. 111) contends that the arbitration proceedings should be terminated and plaintiffs' claims restored to federal court for adjudication on the merits. By contrast, defendants' Motion to Dismiss with Prejudice (doc. 112) posits that plaintiffs' purported refusal to proceed with arbitration amounts to a breach of their contractual duty to arbitrate and warrants outright dismissal of their claims. The Court has reviewed the parties' extensive briefing on these issues, as well as dozens of accompanying exhibits. Both motions are ripe for disposition.

**I.     Relevant Background.**

Back in June 2007, plaintiffs, Lina Scurtu and Cornelia Grozav, filed suit against Hospitality and Catering Management Services ("HCMS"), Wendco Corp. ("Wendco"), and a third defendant (a company called ISE, which settled plaintiffs' claims against it in late April 2008) on theories of breach of contract, fraud, and civil conspiracy, as well as statutory claims under the Trafficking Victim Protection Reauthorization Act of 2003 and civil RICO. Plaintiffs' claims stem from certain agreements whereby defendants were to enroll plaintiffs, who were resident citizens of the Republic of Moldova, in an employment training program in Baldwin County, Alabama, pursuant to which plaintiffs received J-1 visas to the United States. According to the well-pleaded allegations of the Complaint, plaintiffs never received the

promised managerial training, but instead were assigned to work as temporary employees in a Wendco fast food restaurant, performing such rank-and-file duties as food prep, cashier, and cleaning crew.

In 2006, each plaintiff entered into an arbitration agreement with HCMS and Wendco. (*See* doc. 117, at Exh. A.)  After Scurtu and Grozav initiated these legal proceedings in federal court, HCMS and Wendco moved to enforce those arbitration provisions.  Plaintiffs argued that the arbitration agreements were invalid and unenforceable on grounds that their promises to arbitrate lacked mutual assent, were unsupported by consideration, lacked consistency, and were unconscionable under Alabama law.  After briefing and an opportunity for all parties to be heard, the Court entered a 20-page Order (doc. 34) on October 19, 2007, granting HCMS and Wendco's motion to compel arbitration and staying plaintiffs' federal proceedings against those defendants pending the outcome of arbitration.[1]

This case spent the next 30 months mired in arbitration proceedings, with no arbitration hearing being conducted, no substantive issues being definitively resolved, and seemingly interminable discovery disputes and other delays stymieing the progress of arbitration at every turn.[2]  The Court understands that, earlier this year, the parties submitted cross-motions for

---

[1]     The reasoning of the October 19 Order is of some relevance to the present motions.  With regard to the lack of mutual assent argument, the Court concluded that plaintiffs had come forward with no evidence of inability to read or understand the arbitration clause, that the arbitration agreement was short and straightforward, and that well-settled Alabama law foreclosed plaintiffs from circumventing their promises to arbitrate by saying they could not understand that document.  (Doc. 34, at 7-8.)  As to the lack of consideration argument, the Court deemed it meritless based on Alabama authorities holding that continued at-will employment satisfies the consideration requirement for an arbitration agreement.  (*Id.* at 8-9.)  The Court rejected the lack of consistency argument because plaintiffs failed to explain how differing enforcement provisions in the HCMS/Wendco arbitration agreement and in an ISE agreement could possibly invalidate the former.  (*Id.* at 10.)  Finally, the October 19 Order devoted seven pages to plaintiffs' unconscionability argument, finding that plaintiffs had failed to show that the arbitration agreements they signed were either procedurally or substantively unconscionable, much less both, under Alabama law.

[2]     In recent filings in this Court, counsel for each side heaps criticism on his opponents for the inefficient, delay-riddled arbitral proceedings.  It would not be a constructive exercise to dissect the minutiae of this case's two and a half year odyssey in arbitration, parceling out fault for each episode of unnecessary delay, unhelpful detour, obstructionist roadblock, or lack of diligence along the way; therefore, the Court declines the parties' invitations to do so.  Suffice it to say that the record convincingly documents that there is ample (Continued)

summary judgment to the arbitrator, and that those motions have been briefed.  However, the arbitrator has been unable to review or rule on them because a cataclysmic intervening development brought the arbitration proceedings to a screeching halt and triggered the filing of the instant motions, and the ensuing rounds of briefing, by the parties in this District Court.

Specifically, on or about February 19, 2010, plaintiffs petitioned the arbitrator to terminate the arbitration (doc. 112, Exh. 16).  As grounds for this request, plaintiffs cited financial hardship, indicating that "[t]his case has seen approximately $10,000 in fees paid to the arbitrator" and "Plaintiffs [*sic*] counsel have incurred over $30,000 in legal fees and costs." (*Id.* at ¶ 7.)  Plaintiffs further stated that "if the Plaintiffs here are required to remain in arbitration for another six months, one year, or more, the spiraling costs of this process will bar them from obtaining a remedy for their claims." (*Id.*)  On March 1, 2010, the arbitrator entered an order in which he "concluded that this is a matter that can be addressed only to the U.S. District Court. That Court ordered the case to arbitration, and any decision to reverse that Order must be made by that Court." (Doc. 112, Exh. 17, at 1.)  The arbitrator's order of March 1 indicated that he would delay "for a brief period of time" his review of the pending, ripe summary judgment materials "in order to allow the Plaintiffs an opportunity to present their request to the Court." (*Id.*)[3]  The March 1 order reflected that, as of that date, a total of $11,276.00 in arbitrator fees had been billed and paid, of which $4,510.40 had been paid by plaintiffs and $6,765.60 had been paid by defendants.  (*Id.* at 2.)

After further discussions, on March 22, 2010, plaintiffs' counsel notified opposing counsel and the arbitrator in writing that plaintiffs "cannot afford to pay additional costs" of arbitration and that "the decision of whether to continue under this constraint, or not," was the

_____

blame to go around for all parties in transforming what should have been a compact, routine arbitration proceeding into a stagnating sinkhole of time requiring extensive judicial monitoring and direct intervention even years after the fact.  The party-driven breakdown of order and efficiency in the arbitration process is both astonishing and virtually unprecedented in the undersigned's experience.

[3]     Notwithstanding the arbitrator's clear statement in the March 1 order that plaintiffs should take up any request to modify or vacate the order compelling arbitration with this District Court, and not with the arbitrator, plaintiffs waited to file their Motion to Proceed with Claims in this Judicial Forum (doc. 111) until May 10, 2010, some ten weeks later.

arbitrator's. (Doc. 112, Exh. 19, at 1-2.) In essence, then, plaintiffs told the arbitrator on March 22 that if he continued working on the case, he would have to do so without any further fee contributions from them. This fact was highly significant. After all, at the outset of arbitration, plaintiffs (by and through counsel of record) had agreed that the retainer fund from which the arbitrator's hourly fee was to be drawn "would be funded 40% by the plaintiffs and 30% by each of the two defendants." (Doc. 112, Exh. 1, at 1.)[4] One result of plaintiffs' announcement was that the arbitrator faced the unwelcome prospect of receiving only 60% of his fee from that moment onward. As he properly recognized, however, the ramifications of this development were much worse than that. Given that plaintiffs would not contribute any further to his fees, the arbitrator knew that the only way he could be compensated in full for his time would be if he ruled for plaintiffs on the merits and ordered defendants to pay his full arbitration fees as part of the final award. This scenario was tantamount to a conflict of interest.[5] On that basis, the arbitrator notified the parties via e-mail on March 22, 2010 that "I do not believe that I can proceed in the matter. … I still remain ready and willing to arbitrate the matter, … but unfortunately I do not believe that I can ethically do so under the current conditions." (Doc. 112, Exh. 19.)

Despite the arbitrator's unequivocal statement on March 22 that he could not proceed to hear the case because of this emergent ethical problem, the parties did not request relief from this District Court until May 10, 2010, the last possible day for doing so pursuant to an Order (doc. 109) entered by the Court. Both sides separately petitioned the Court for relief. In their May 10 Motion, plaintiffs argue that the arbitration should be terminated, the October 2007 order referring the case to arbitration should be vacated, and the case should go to trial in this District

---

[4]     This agreement specifically provided that, at the conclusion of arbitration, the arbitrator retained discretion to allocate payment of fees and expenses by any party. (*Id.* at 5.) In other words, the 40-30-30 fee split to which all parties assented was only for purposes of the arbitrator's retainer fund, and did not impair the arbitrator's ability at the conclusion of the case to award fees and costs as he saw fit.

[5]     As the arbitrator put it in an e-mail to the parties dated March 22, 2010, "I am not only concerned about the payment of my fees, but I also believe that, unless there is some confirmation that they are paid, there would appear to be a conflict of interest in that how I rule on the merits of the case could have a substantial impact on whether I am ultimately paid." (Doc. 112, Exh. 19.)

Court.  By contrast, in their May 10 Motion, defendants urge the Court to dismiss plaintiffs' claims with prejudice for failure to perform their agreed-upon arbitration duties.  Armed with the parties' briefs and exhibits, the Court will now evaluate these factually and legally intertwined motions.[6]

## II.    Plaintiffs' Motion to Withdraw Reference to Arbitrator.

In their Motion to Proceed with Claims in this Judicial Forum, plaintiffs identify three grounds for relief, to-wit: (i) the arbitration agreements are unenforceable for lack of mutual assent and unconscionability; (ii) the arbitrator's intent was for Scurtu and Grozav to litigate their claims to conclusion in federal court; and (iii) arbitration is an economic impossibility for plaintiffs.  The Court will consider each of these arguments independently.

### A.    *Enforceability of Arbitration Agreements.*

Plaintiffs recognize that the October 2007 Order (doc. 34) examined their attacks on the validity of the arbitration agreements, and specifically deemed those agreements enforceable. According to plaintiffs, they "do not seek to re-litigate this issue."  (Doc. 111, at 5.)  However, they then proceed to do just that, repeating previously-rejected arguments that plaintiffs did not knowingly or voluntarily assent to the arbitration agreements and that the agreements are unconscionable under Alabama law.  (*Id.* at 6-9.)  Plaintiffs' only justification for rehashing

---

[6]     In so doing, the Court will not indulge the strident tone, sarcasm, and rancor that permeates the parties' (and particularly plaintiffs') briefing, as well as their correspondence, judging by the trail of acrimony found in e-mail exhibits.  Among numerous possible examples, plaintiffs' counsel uses the pejorative and inflammatory phrase "churning time and expenses" at least four times in a single brief (doc. 115) to describe opposing counsel's conduct and responds to one of opposing counsel's arguments by exclaiming "How Orwellian!"  The Court understands that these proceedings have been lengthy, tedious and contentious, and that there may be good reason for emotions to run high.  But undisguised hostility, name-calling, and general lack of civility neither assist the Court nor advance the parties' respective positions in any constructive manner.  Moreover, the Court strongly suspects that counsels' demonstrated vitriol towards each other throughout the lifespan of this action has contributed to the dilemma in which their respective clients now find themselves, by inhibiting their ability to work together in good faith to resolve what should have been a minor, ancillary, non-merits arbitrator fee issue. In the undersigned's experience, litigants routinely resolve arbitrator fee concerns themselves, rather than resorting to time-consuming, expensive, slash-and-burn litigation of those issues as counsel have done here.  The parties have undoubtedly spent far more than the $1,332 arbitrator fee request at issue (and have added months to this already hoary dispute) in pressing their respective Motions concerning plaintiffs' non-payment of that amount.

enforceability issues that this Court has previously decided is that new, favorable "evidence …

has arisen during the three years of pending arbitration." (Doc. 111, at 5.)[7]

In effect, then, plaintiffs are asking this Court to reconsider, nearly three years after the

fact, the October 2007 Order (doc. 34) rejecting plaintiffs' lack of mutual assent and

unconscionability defenses to the arbitration agreements.[8] To support their position, plaintiffs

explain that "[d]iscovery has brought forth evidence" demonstrating lack of assent and

unconscionability. (Doc. 111, at 6-9.) But this new "evidence" obtained during arbitration

consists of plaintiffs' own deposition testimony, and the testimony of others about plaintiffs'

language skills. All of this evidence was plainly available to plaintiffs before. Had plaintiffs

wished to do so, they could have presented this evidence for the Court's consideration prior to

---

[7]     Plaintiffs also suggest in a footnote that this Court's jurisdiction to decide whether
the arbitration agreements were unconscionable "has always been in question." (Doc. 111, at 5
n.3.) Not so. Plaintiffs' brief (doc. 23) filed in opposition to the motion to compel arbitration
back in August 2007 never asserted that the unconscionability determination was properly the
province of the arbitrator and not this Court. To the contrary, that brief concluded with a
statement that "Plaintiffs strongly urge this Court to find the arbitration agreement invalid,
unconscionable, and therefore unenforceable." (Doc. 23, at 20.) Any error that may have
existed by virtue of the undersigned making findings as to unconscionability was therefore
invited by plaintiffs. Besides, the Supreme Court case cited by plaintiffs now, *Rent-a-Center
West, Inc. v. Jackson*, --- S.Ct. ----, 2010 WL 2471058 (June 21, 2010), concerns interpretation
of a delegation provision that no party in this case has ever invoked, and that therefore appears to
have been waived.

[8]     Plaintiffs insinuate that the Court simply glossed over these concerns, indicating
that the October 2007 Order "gave little recognition of these issues." (Doc. 111, at 5.) There is
no room to challenge whether these issues were actually and finally decided in the October 2007
Order. Indeed, that Order explained that "there is an utter failure of proof to support plaintiffs'
contention that the Agreements are void for want of mutual assent. They have failed to proffer
any evidence that they could not read the Agreements, that they could not understand the
Agreements, [or] that they were not given the recited opportunity to consult with counsel of their
own choosing …. Alabama law does not automatically absolve non-native English speakers of
all responsibility to honor contracts they sign …. Accordingly, plaintiffs' argument that the
Agreements are void for want of mutual assent is without factual or legal merit." (Doc. 34, at 8.)
On the subject of unconscionability, the October 2007 Order found no evidence that the
agreements' terms were grossly unfavorable to plaintiffs, no showing that plaintiffs lacked
meaningful choice in signing the agreements, and no legal requirement that the agreements spell
out a fee arrangement to prevent unconscionability. (*Id.* at 12-15.) The Court thus examined
plaintiffs' lack of mutual assent and unsconscionability arguments in substantial detail in the
October 2007 Order. Any suggestion to the contrary is false.

entry of the October 2007 Order. They elected not to do so. It is beyond cavil that a party cannot multiply judicial proceedings and obtain reconsideration on the merits by marshaling previously available facts in support of arguments that have already been considered and rejected.[9] The same principles and authorities unequivocally defeat plaintiffs' efforts to reargue issues of lack of meaningful choice, silence on fees as creating unconscionability, and so on, and to inject brand-new (but previously available) arguments that the agreements are self-serving and that defendant HCMS deceived or coerced plaintiffs into signing.

There is a more fundamental defect with plaintiffs' efforts to seek reconsideration of the October 2007 Order. Although plaintiffs cite no authority supporting reconsideration, any such request would necessarily be brought pursuant to Rule 60(b), Fed.R.Civ.P., which authorizes a court to relieve a party from an order for certain enumerated reasons. But a Rule 60(b) motion "must be made within a reasonable time." Rule 60(c)(1). Plaintiffs waited more than 30 months to seek reconsideration of the order compelling arbitration, during which time the parties had expended considerable resources in arbitration. If plaintiffs believed the order compelling arbitration was manifestly erroneous, they should have sought reconsideration immediately rather than waiting until the arbitration process was nearly concluded. Such delay was not reasonable, and precludes plaintiffs' efforts to relitigate mutual assent, unconscionability, and other enforceability issues pertaining to the agreements at this time. Moreover, any request for relief under Rule 60(b)(2) (newly discovered evidence) fails because plaintiffs' own testimony,

---

[9] *See, e.g., Richardson v. Johnson*, 598 F.3d 734, 740 (11th Cir. 2010) ("A motion for reconsideration cannot be used to relitigate old matters, raise argument or present evidence that could have been raised prior to the entry of judgment.") (citation and internal quotation marks omitted); *Case v. Eslinger*, 555 F.3d 1317, 1329 (11th Cir. 2009) (motions to reconsider "should not be used to raise arguments which could, and should, have been made before the judgment was issued," and denial of such motions "is especially soundly exercised when the party has failed to articulate any reason for the failure to raise the issue at an earlier stage in the litigation"); *American Home Assur. Co. v. Glenn Estess & Associates, Inc.*, 763 F.2d 1237, 1239 (11th Cir. 1985) (cautioning against use of motion to reconsider to allow movant "two bites at the apple"); *Garrett v. Stanton*, 2010 WL 320492, *2 (S.D. Ala. Jan. 18, 2010) ("Far too often, litigants operate under the flawed assumption that any adverse ruling on a dispositive motion confers upon them license to move for reconsideration …, and to utilize that motion as a platform to criticize the judge's reasoning, to relitigate issues that have already been decided, to champion new arguments that could have been made before, and otherwise to attempt a 'do-over' to erase a disappointing outcome. This is improper.").

language capabilities, and legal understandings do not constitute "newly discovered evidence" as a matter of law. *See Taylor v. Texgas Corp.*, 831 F.2d 255, 259 (11th Cir. 1987) ("[E]vidence cannot be 'newly discovered' under Rule 60 if it is in the possession of the moving party … prior to the entry of judgment."). Similarly, to the extent plaintiffs invoke the Rule 60(b)(6) catch-all provision, they have failed to show the exceptional circumstances necessary for relief under that section. *See Frederick v. Kirby Tankships, Inc.*, 205 F.3d 1277, 1288 (11th Cir. 2000) ("Federal courts grant relief under Rule 60(b)(6) only for extraordinary circumstances."). Plaintifffs have plainly not satisfied the rigorous standards for relief under Rule 60(b).[10]

For all of the foregoing reasons, the Court will not consider the merits of plaintiffs' arguments concerning lack of mutual assent, unconscionability or other purported defects in the arbitration agreements at this time. Such issues have been improperly raised and fall well outside the parameters of Rule 60(b) for reconsideration of the October 2007 Order, which fully examined and adjudicated plaintiffs' objections to the validity and enforceability of those agreements. Now is not the time to revisit, relitigate, and reargue those rulings based on previously available evidence and theories.

> ### B. Arbitrator's Intent.

Next, Scurtu and Grozav contend that this Court must allow them to litigate their claims against HCMS and Wendco in this forum because the arbitrator has ordered that it be so. It is true that, under Alabama law, trial courts must give effect to the arbitrator's intent when the arbitrator decides to return a case to court. In *Smallwood v. Holiday Development, LLC*, --- So.3d ----, 2009 WL 3805796 (Ala. Nov. 13, 2009), the defendant condominium developer successfully moved to compel arbitration of claims filed against it in state court by prospective purchasers. However, the arbitrator dismissed those proceedings when the developer was unable to pay its share of arbitration fees, and "remanded" the case to state court so that the purchasers could pursue their claims in that forum. Upon receiving the case back from the arbitrator, the trial court simply entered an order dismissing it. The Alabama Supreme Court reversed,

---

[10] A "very strict interpretation of Rule 60(b) is essential if the finality of judgments is to be preserved." *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 873 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988) (Rehnquist, J., dissenting); *see also Cano v. Baker*, 435 F.3d 1337, 1340 (11th Cir. 2006) (recognizing that need for finality of judgments outweighed equitable circumstances identified by plaintiff in her Rule 60(b) motion).

reasoning that "[t]he proper way for the trial court to give effect to the order of the arbitrator would have been to schedule the 'further proceedings' necessary for the purchasers to pursue their claims" against the developer in court. *Id.* at *3. So *Smallwood* stands for the proposition that, upon receiving a case back from the arbitrator, a trial court must give effect to the arbitrator's intent, which in *Smallwood* was that the purchasers would litigate their claims against the developer in court.[11]

In urging this Court to give effect to the arbitrator's intent, plaintiffs overstate by a wide margin what he actually said and did in this case. According to plaintiffs, the arbitrator "has now sent this matter back to this Court" and has expressed an intent "for this Court to take the proverbial ball the final figurative ten yards to the goal." (Doc. 111, at 12-13.) Plaintiffs further state that "these orders from the arbitrator direct the court to re-assert jurisdiction over the full set of claims, and proceed with adjudicating such claims in this judicial forum." (Doc. 116, at 11.) The arbitrator did no such thing. Far from terminating the arbitration proceedings and sending the case back to federal court, the arbitrator expressly <u>deferred</u> to this Court on the issue of where plaintiffs' claims should proceed, opining that this Court "ordered the case to arbitration, and any decision to reverse that Order must be made by that Court." (Doc. 112, Exh. 17, at 1.) To be sure, the arbitrator later indicated that "I do not believe that I can proceed in the matter" barring resolution by the parties of the fee issue. (Doc. 112, Exh. 19, at 1.) But he did not direct the parties to return to federal court; rather, he simply demurred from taking any action, and instead outlined options for the parties that included scenarios under which arbitration could proceed before him if the parties made appropriate fee arrangements. (*Id.*)[12]

---

[11]    Because of confusion in the parties' briefs, the Court stresses that the above principle is the only one for which *Smallwood* is relevant here. *Smallwood* also included a discussion that, "even though two parties may have contractually agreed to arbitrate any disputes that arise between them, such disputes may nevertheless be resolved in the court system if either party waives its right to compel the other to arbitrate its claims." *Id.* at *3 n.1. Here, however, defendants (the parties that want arbitration) have done nothing to waive their right to compel arbitration, so that principle is not germane to this dispute, at least not right now.

[12]    Given the plain text of the arbitrator's March 22 correspondence to the parties, plaintiffs' representation that "[t]he Arbitrator has ruled that [plaintiffs' financial] circumstances cannot be addressed with a modification in payment arrangements but only with a referral back to federal court for resolution" (doc. 116, at 6) appears counterfactual. The same goes for plaintiffs' contention that "the arbitrator has made a referral of this matter back to this court" (Continued)

In light of the foregoing, the Court rejects plaintiffs' ill-conceived premise that the arbitrator has somehow directed this action to be heard to conclusion in federal court, or that refusing to rescind the October 2007 Order compelling arbitration would do violence to the arbitrator's intent. The arbitrator's clearly expressed intent was that either (a) the parties work out the money issues to assure "payment of my fees without regard to the outcome," thereby eradicating the conflict of interest and enabling the arbitrator to resume his duties, or (b) "the plaintiffs apply to the court for some resolution of the issue." (Doc. 112, Exh. 19, at 1.) Based on the arbitrator's unambiguous statements, in which he effectively stepped aside to allow the parties themselves or this Court to figure out what to do, *Smallwood* and issues of arbitrator intent have no bearing on plaintiffs' Motion to Proceed with Claims in this Judicial Forum, and certainly do not demand that the Motion be granted.[13]

C.    ***Arbitrator Fees and Economic Impossibility.***

1.    ***Arbitration Agreement Not Invalid for Fee Silence.***

Plaintiffs' final ground for seeking to terminate the arbitration proceedings and return to federal court is labeled "Arbitration Fees." (Doc. 111, at 10.) Plaintiffs articulate two arguments under this heading. First, they state that, under federal law, "a mandatory arbitration agreement, which is entered into as a condition of continued of [*sic*] employment, and which requires an employee to pay a portion of the arbitrator's fees, is not enforceable under the Federal

---

(doc. 115, at 11) and their reference to the arbitrator's purported "orders returning this matter to Federal Court." (*Id.* at 9.) Such "referrals" and "orders" simply do not exist.

[13]    The Court recognizes the possibility that a party could argue that certain issues addressed in this Order (*i.e.*, whether plaintiffs can avoid arbitration on grounds of prohibitive expense and inability to pay, whether they have breached the fee agreement, etc.) should be directed to the arbitrator rather than a federal court. The Court does not consider this question because (a) both sides have asked this Court to resolve the legal and procedural quagmire in which they find themselves, and (b) the arbitrator himself has declined to resolve those issues but instead deferred to this Court. Neither party has requested that the undersigned direct the arbitrator to decide these questions, or has otherwise expressed dissatisfaction with the arbitrator's "hands' off" approach. Nor does this Court fault the arbitrator's reticence to delve into these issues; after all, as of now, he is no longer being paid for his labors, and is understandably wary of creating a perception that he is deciding issues in a particular way for his own financial benefit.

Arbitration Act." (*Id.*)[14]  This proposition is incorrect, as a matter of law.  As the Eleventh Circuit has explained in the employment context, "an arbitration agreement is not unenforceable merely because it may involve some 'fee-shifting.'"  *Musnick v. King Motor Co. of Fort Lauderdale*, 325 F.3d 1255, 1259 (11th Cir. 2003); *see also Bess v. Check Express*, 294 F.3d 1298, 1304 (11th Cir. 2002) (where "arbitration agreement is silent on the subject" of arbitration fees, "that fact alone is insufficient to render the agreement unenforceable").  The Court therefore rejects plaintiffs' assertion (assuming they have not already abandoned it) that the arbitration agreements they signed are *per se* unenforceable because plaintiffs later agreed to pay a portion of the arbitrator's fees.

## 2. The "Prohibitively Expensive" Standard.

Plaintiffs' second argument is more intriguing.  According to plaintiffs, "continued arbitration is an actual economic impossibility" for them.  (Doc. 111, at 10.)  Because, plaintiffs contend, they are unable to pay their share of the arbitrator's fees going forward, forcing them to remain in the arbitral forum will cause them to be "left without substantial redress for any loss and … effectively without a remedy."  (*Id.*)  At its core, plaintiffs' argument is that they should be allowed to proceed in federal court because they are financially incapable of proceeding in arbitration, such that the arbitration process cannot yield a complete and final adjudication of their claims.

Under well-established law, an agreement to arbitrate may be unenforceable "if the cost of arbitration precludes the effective vindication of statutory rights in arbitration. … [W]here, as here, a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs."  *Anders v. Hometown Mortg. Services, Inc.*, 346 F.3d 1024, 1028 (11th Cir. 2003) (citations and internal quotation marks omitted); *see also Madura v. Countrywide Home Loans, Inc.*, 344 Fed.Appx. 509, 515 (11th Cir. Aug. 17, 2009) ("A party who seeks to invalidate an arbitration agreement on the basis that arbitration would be prohibitively expensive bears the

---

[14]     In light of this quotation from plaintiffs' principal brief, it is difficult to fathom plaintiffs' insistence in their reply that they "make no such argument" that "an arbitration agreement which requires an employee to pay a portion of the arbitrator's fee is not enforceable under the Federal Arbitration Act."  (Doc. 116, at 3.)  Such unexplained contradictions in plaintiffs' position are unhelpful.

burden of showing the likelihood of incurring such costs.") (citations and internal quotation marks omitted).  Thus, it is plaintiffs' burden in this case to establish that arbitration is prohibitively expensive, thereby precluding the effective vindication of their rights in arbitration and enabling them to proceed in court.

### 3. *Plaintiffs Promised to Pay 40% of Arbitrator Fees.*

The arbitration agreements that Scurtu and Grozav executed in the fall of 2006 do not demonstrate a likelihood of prohibitive expense.  Indeed, those agreements say nothing at all about who will foot the bill for arbitration costs and fees.  (Doc. 117, at Exhs. 1&2.)  After this Court entered the October 2007 Order compelling arbitration, and after the parties selected their arbitrator, they entered into a written agreement (the "March 2008 Agreement") concerning the fee issue.  In the March 2008 Agreement, the parties (by and through counsel of record) agreed as follows: (1) the arbitrator would receive a fee of $300 per hour for his work on the matter; (2) the parties would fund a retainer in the amount of $5,000 from which the arbitrator would collect his fees from time to time; (3) whenever the balance of the retainer fund dipped below $2,000, the parties would restore it to the $5,000 level; and (4) "[t]he retainer will be funded 40% by the plaintiffs and 30% each by HCMS and Wendco."  (Doc. 112, Exh. 1, at 5; doc. 115, Exh. D.)[15] The March 2008 Agreement further provided that this plan for allocation of funding sources for the arbitrator's retainer "will have no bearing as to any ultimate determination as to payment of fees and expenses by any party."  (*Id.*)  Thus, if for example plaintiffs prevailed on the merits, the March 2008 Agreement would not preclude the arbitrator from holding defendants responsible for paying all of his fees (or reimbursing plaintiffs for the portion they had paid previously).

Without objection or dissent from defendants, plaintiffs indicate that their promise to pay 40% of the arbitrator retainer fees was subject to a caveat.  Specifically, plaintiffs' counsel reserved the right to "revisit this issue" of allocation of payments for the arbitrator's retainer fund "[s]hould my client's [*sic*] financial circumstances change."  (Doc. 115, Exh. E.) According to plaintiffs' counsel, that is precisely what happened because Scurtu and Grozav are

---

[15]        There is not and can be no suggestion by plaintiffs that the March 2008 Agreement was coerced or involuntary.  Plaintiffs' counsel, who negotiated that agreement for them, admitted at the time, "I cannot in good faith argue that my clients cannot afford the costs of arbitration," and agreed to forward plaintiffs' payments to the arbitrator.  (Doc. 115, Exh. E.)

unable to continue financing the arbitrator's fees in this long-running arbitration proceeding. Defendants dispute plaintiffs' allegations of financial hardship, and suggest that plaintiffs are stonewalling as to the arbitrator's fees in a calculated act of gamesmanship to regain a federal court forum. In defendants' view, plaintiffs' Motion equates to an attempt "to renege on their agreement with arbitrator and the Defendants," meaning the March 2008 Agreement. (Doc. 114, at 5.)[16] To sift through these competing arguments, the Court must scrutinize the record evidence of plaintiffs' financial status and ability to pay.[17]

### 4.    *Plaintiffs' Evidence that Arbitration is Prohibitively Expensive.*

As proof of financial hardship, plaintiffs point to two lines of evidence. First, they document the arbitrator's fees. As of April 21, 2010, the parties had collectively paid arbitrator fees in the amount of $11,250.00, and there were current unbilled fees of $2,610.00, for total billed and unbilled charges of $13,860.00. (Doc. 110, Exh. A.) Effective April 28, the arbitrator utilized the retainer fund established by the parties (again, with each defendant shouldering 30%

---

[16]    As defendants frame the issue, plaintiffs "have seen the writing on the wall and simply have refused to pay, for no other reason than their desire to return to federal court and obtain a jury trial." (Doc. 114, at 7.)

[17]    Two points should be noted from the outset of this exercise. First, plaintiffs repeatedly suggest that this Court is somehow precluded from or limited in evaluating plaintiffs' financial status because this issue has already been decided by the arbitrator. (Doc. 115, at 11; doc. 116, at 6.) Indeed, plaintiffs contend that the arbitrator "has ruled that Plaintiffs cannot afford to continue funding the arbitration" (doc. 115, at 9) and that "the opinion of the arbitrator" constitutes a "controlling standard" (*id.* at 5) binding this Court. This is a misstatement of the facts. The arbitrator received no evidence and made no rulings adjudicating plaintiffs' ability to pay, much less their compliance with or breach of the March 2008 Agreement. Rather, he simply stated that, "[b]ase[d] on plaintiffs' affirmation that they can no longer pay their portion of the arbitrator's fees, I do not believe that I can proceed in the matter." (Doc. 112, Exh. 19.) This statement by the arbitrator was in response to correspondence from plaintiffs' counsel indicating that "[w]e have consulted with our clients and they confirm that they cannot afford to pay additional costs." (*Id.*) The arbitrator made <u>no</u> findings of fact, but merely relied on plaintiffs' counsel's unadorned representation of inability to pay. Because the record is clear that the arbitrator has made no findings about plaintiffs' ability to pay or the status of the March 2008 Agreement, this Court is not constrained or confined in its analysis of these issues. Second, defendants protest that they "have had no opportunity to discover relevant information" concerning plaintiffs' claims of inability to pay. (Doc. 114, at 6.) This objection is unavailing. No party has requested discovery or an evidentiary hearing as to ability to pay. Additionally, plaintiffs have submitted financial statements, signed on penalty of perjury. The Court will accept these exhibits as documentation bearing on plaintiffs' ability to pay the arbitrator's fees.

and plaintiffs paying a combined total of 40%) to obtain payment of the $2,610.00 bill. (*Id.*) This means that, to date, the parties have paid the arbitrator a grand total of $13,860. Some 40%, or $5,544.00, was paid by Scurtu and Grozav. (*Id.*) The arbitrator's correspondence indicated that plaintiffs were responsible for paying an additional $1,332.00 (or $666 each) at that time to restore the retainer fund to its agreed-upon level. (*Id.*) In lieu of anteing up the requested retainer funds to replenish the fund and enable the arbitrator to decide the pending, ripe motions for summary judgment, plaintiffs announced that they could no longer afford to pay, setting in motion a sequence of events that inexorably culminated in motion practice before this Court.

Plaintiffs' second category of evidence consists of their financial statements in the form of this District Court's standard motion to proceed without prepayment of fees. (Doc. 111, Exh. B.)[18] Plaintiff Grozav's statement reflects that her sole wage and salary income is the $400 per week she earns from a restaurant where she is employed as a server. Grozav indicates that she has $700 in the bank, owes more than $4,000 in revolving credit debt, and pays monthly rent of $800.[19] She further states that she has no dependents and is separated from her husband;

---

[18]     Defendants object that plaintiffs' financial representations are "unsupported by affidavit or otherwise admissible evidence." (Doc. 112, at 10 n.7.) This objection is unfounded. Plaintiffs' exhibits are in fact signed under penalty of perjury, with plaintiffs certifying that their responses are true and correct to the best of their knowledge and belief. To be sure, plaintiffs' election to submit *in forma pauperis* petitions (even though they are not seeking IFP status) rather than detailed declarations or affidavits concerning ability to pay is unorthodox; however, presenting the information in this format is not improper, and adequately conveys plaintiffs' facts concerning their financial status in a form that is readily reducible to admissible evidence. The Court will consider these exhibits in their present form, notwithstanding defendants' objection.

[19]     Defendants challenge Grozav's portrayal of her financial condition in several respects. For example, defendants point to Grozav's tax and financial records to show that she earns more than $400 per week; however, her 2008 W-2 form from the restaurant where she now works shows that she averaged $417 per week in wages and tips that year. (Doc. 114, Exh. 5.) This figure is in line with the $400 figure quoted by Grozav in her financial affidavit. Defendants' suggestion that Grozav must be lying because a single paystub (doc. 114, Exh. 6) shows that she earned $1,344.58 (including more than $1,000 in tips) during a two-week stint in February 2009 (spanning Valentine's Day, Mardi Gras, and the President's Day holiday weekend, which would reasonably be expected to be an atypical period for the restaurant business in a tourist town on the Florida Gulf Coast) is unavailing without any factual basis for extrapolating it across a calendar year, or to the present. Likewise, defendants' suggestion that Grozav must be able to afford the arbitrator's fees because she purchased a "new car" (doc. 114, at 5) in July 2008 is not persuasive. The unrebutted evidence is that Grozav purchased a 2004 Pontiac Grand Prix using, in part, proceeds from the ISE settlement for purposes of commuting (Continued)

however, Grozav makes no representations as to whether her spouse contributes to her financial support and if so in what amount. Grozav has provided no backup documentation to confirm her $400/week estimate, even though such exhibits would be readily available to her via current paystub, 2009 W-2 form, or her most recent income tax returns.

As for plaintiff Scurtu, her statement reflects a considerably brighter financial picture. (Doc. 111, Exh. B.) In particular, Scurtu indicates that she is married with no children, and that her household income is approximately $4,840 per month (including her wages of $300 per week earned as a sales associate in a retail store and her husband's military income of $3,640 per month). The only monthly expenses identified in Scurtu's affidavit are $1,379 in mortgage payments, $700 for the support of her in-laws, and $600 in debt service payments, leaving more than $2,100 in discretionary monthly income.

### 5. *Plaintiffs Have Failed to Meet their Burden.*

As discussed *supra*, the law allows plaintiffs to be excused from their contractual obligation to arbitrate if they can show that arbitration would be so "prohibitively expensive" for them as to "preclude[] the effective vindication" of their rights in the arbitration process. *Anders*, 346 F.3d at 1028. The parties have not identified any authorities shedding light on the meaning of the "prohibitively expensive" standard or the quantum of proof needed to meet that threshold. However, it is clear from *Anders* that arbitration must be so expensive that it would "preclude" the plaintiffs from being able to proceed in arbitration. This is a high bar, one that is satisfied only if the plaintiffs can establish their inability to pay the arbitrator's fees. *See Musnick*, 325 F.3d at 1260 (party seeking to avoid arbitration based on high costs "has an obligation to offer evidence of the amount of fees he is likely to incur, as well as of his ***inability to pay those fees***") (emphasis added).

------

to work. In and of itself, the fact that Grozav owns a six year-old, paid-for private vehicle does not demonstrate that she is reasonably able to pay her share of the arbitrator's fees. Finally, defendants' criticism that Grozav "should have put away a portion of the settlement proceeds" (doc. 114, at 6) from the ISE settlement in spring 2008 to fund the arbitration fails because (a) there is no indication that Grozav did not do so, and (b) in any event, Grozav's financial statement identifies her existing cash reserves, and defendants' Monday morning quarterbacking about what Grozav could or should have done in the past is not illuminating as to the pressing question of her present-day ability to pay.

In this respect, then, the applicable legal standard appears closely analogous (as plaintiffs implicitly recognize, given their filing of IFP petitions) to that for *in forma pauperis* eligibility under 28 U.S.C. § 1915. In that context, a plaintiff seeking to be excused from payment of fees and costs must establish "that the litigant, because of his poverty, is unable to pay for the court fees and costs, and to support and provide necessities for himself and his dependents." *Martinez v. Kristi Kleaners, Inc.*, 364 F.3d 1305, 1307 (11th Cir. 2004). In a reasonable construction of the *Musnick / Anders* language, and in the absence of contrary or divergent authorities identified by the parties, the Court finds it appropriate to import this standard into the "prohibitively expensive" inquiry. In other words, a plaintiff seeking to be relieved of a contractual obligation to arbitrate on grounds that arbitration is prohibitively expensive must show that she cannot both pay the arbitrator's fees and support and provide necessities for herself and her dependents. That is the test by which plaintiffs' evidentiary showing will be gauged. Therefore, the Court must weigh and balance the arbitrator's fees due against the plaintiffs' financial resources and other financial obligations to determine whether plaintiffs have adequately shown that they cannot afford to pay those fees.

Here's what we know about the arbitrator's fees. In the more than two years that arbitration has been pending, with innumerable discovery disputes, logistical difficulties, and false starts along the way, the arbitrator's total charges are $13,860. At the outset of arbitration, plaintiffs' counsel acknowledged in writing that his clients had the ability to pay arbitration fees, and entered into an agreement whereby plaintiffs collectively would be responsible for 40% of the arbitrator's fees. To date, plaintiffs have together paid $5,544.00 in arbitrator fees.[20] We do not know (because plaintiffs have adduced no evidence) how much it will cost for the arbitrator to review and rule on the pending motions for summary judgment. We do know, however, that the arbitrator has been economical and efficient in his billings to date, so there is no reason to think that the costs associated with his review and ruling on the parties' cross-motions for summary judgment will be exorbitant, or that any further contributions to the retainer fund

---

[20]     We do not know (because plaintiffs have presented no evidence) how much of this money came from plaintiffs' settlement with ISE, and how much of it originated from their own wage and salary income. Nor do we know whether plaintiffs have borne this expense equally, or whether one or the other of them has paid a disproportional share of their 40% collective contribution.

beyond the specific amount now at issue will be needed to enable him to complete the summary judgment process.

More importantly, it bears emphasis that the only arbitrator fee obligation plaintiffs face at this time consists of the arbitrator's request that they pay $1,332 in the aggregate to replenish his retainer fund to its agreed-upon baseline level. Plaintiffs pulled the plug on the arbitration by telling the arbitrator they could not afford to make those payments, thereby creating the conflict of interest that forced the arbitrator to suspend arbitral proceedings. Through the parties' pending Motions, the Court is being asked to assess the propriety and validity of plaintiffs' conduct. The question presented at this time is, at its core, not whether plaintiffs are financially able to fund arbitrator fees in perpetuity to the tune of untold thousands of dollars, but whether plaintiffs can afford to pay $666 each in fees to enable the arbitrator to dispose of the pending cross-motions for summary judgment.[21] Simply put, if plaintiffs are able to contribute $1,332 to the arbitrator's retainer fund, then their March 2010 actions precipitating the suspension of arbitration are unjustified and they are not entitled to relief under their Motion to Proceed with Claims in this Judicial Forum.

Plaintiffs have not shown that paying the requested amount to the arbitrator's retainer fund would prevent them from supporting and providing necessities for themselves and their dependents. Plaintiff Scurtu has more than $4,800 in monthly household income, but less than $2,700 in documented monthly expenses, even assuming that her mother- and father-in-law are

---

[21]     The Court does not consider any arbitrator's fees associated with taking this matter to final hearing because (a) plaintiffs have failed to meet their burden under *Musnick* of showing what those fees would be, and (b) the prospect of a final hearing on the merits ever taking place is speculative at this point given the pendency of ripe dispositive motions that have been submitted and briefed by both sides. Plaintiffs create a false dilemma by attempting to reframe the issue in this case as being whether they can afford to pay unbounded, limitless arbitrator fees until the end of time. Properly framed, the issue is, in part, one of timing (*i.e.*, were plaintiffs permitted by law and contract to cease contributing to the arbitrator's fees now, as opposed to at some other time). Stated differently, the question is not whether plaintiffs may become unable to contribute to the arbitrator's fees at some speculative future time based on some speculative future developments, but whether they are unable to meet their contractual obligations to pay the fees needed by the arbitrator at this time to carry on with his responsibilities.

properly counted as her dependents (which the record does not document).[22]  Plaintiff Grozav is separated from her husband, and there is no indication as to whether he is contributing to her present financial support.  Even assuming that he is not, there is no documentation of Grozav's monthly expenses other than her $800 for rent and $85 in debt service payments.  Grozav indicated that she has $700 in cash in a bank account, without identifying any reason why those funds could not be used to finance her portion of the $1,332 in arbitrator fees due and owing.  Where Grozav has admitted that she has cash on hand in an amount sufficient to meet her share of the arbitrator's fee requirement, and has not explained why allocating those funds in that manner would impose a hardship on her, the Court cannot find that she has met her burden of establishing inability to pay.[23]

There is another, more fundamental problem with plaintiffs' argument.  Recall that in the March 2008 Agreement, plaintiffs agreed to pay 40% of the arbitrator's retainer fund, subject to the caveat by plaintiffs' counsel that "[s]hould my client's [*sic*] financial circumstances change, I

---

[22]      The bulk of Scurtu's household income is earned by her husband, rather than by Scurtu herself.  Plaintiffs' counsel scoffs at the notion that "Scurtu's husband … should be partially responsible for any arbitration costs."  (Doc. 116, at 9.)  But counsel offers no authority for the proposition that ability to pay is gauged on an individual basis, rather than a household basis.  Moreover, Scurtu's argument attempts to have it both ways.  Her financial statement addresses household expenses, not personal expenses.  For example, Scurtu wants "credit" for her household's $1,379 monthly mortgage payment and the $700 payments to her in-laws, without regard to whether those expenses are paid through her income or her spouse's income.  She wants the Court to find that she cannot meet the basic necessities of life if she has to pay the arbitrator, without factoring in her husband's contributions to her day-to-day finances.  It would be incongruous, asymmetrical, and frankly nonsensical to omit her husband's share of household income (but not his share of household expenses) from the "ability to pay" calculus, yet that is effectively what plaintiffs propose.  Absent some legal or factual basis for ignoring or disqualifying Scurtu's husband's income, which plaintiffs have not identified, the Court will not exclude it from the analysis of her ability to pay.

[23]      One additional point is worth noting as to Grozav's financial status.  The March 2008 Agreement specified that the arbitrator's retainer "will be funded 40% by the plaintiffs and 30% each by HCMS and Wendco."  (Doc. 116, Exh. B.)  This language is significant because, while defendants agreed to pay 30% each, plaintiffs <u>collectively</u> agreed to pay 40%, without allocating that obligation to 20% for each plaintiff.  If Scurtu is financially able to pay the 40% (and there has been no showing that she is not), then Grozav's ability or inability to pay anything would become irrelevant.  Plaintiffs appear to assume that their commitment is for each plaintiff to pay a *pro rata* 20% share, but that is not what the written agreement states.

will notify you and advise as to whether we must seek to revisit this issue." (Doc. 115, Exh. E.) Explicit or implicit in plaintiffs' present efforts to avoid the March 2008 Agreement is the notion that plaintiffs' financial circumstances have changed, thereby activating that escape clause and entitling them to nullify or modify that commitment. The record does not show how, if at all, Scurtu and Grozav's financial circumstances changed between March 2008 (when they agreed to contribute 40% to the arbitrator's retainer fund, and when their lawyer admitted he could not in good faith maintain that they were unable to pay) and March 2010 (when they announced that they would no longer pay anything). Do they earn materially less money than they did two years ago? Are their expenses materially higher than they were? The record does not contain any facts concerning plaintiffs' financial circumstances in March 2008, much less any evidence that might support a finding of changed circumstances to enable plaintiffs to negate their freely-given, voluntary promise to pay 40%. The mere unanticipated duration of the arbitration process, by itself, is not a change in plaintiffs' financial circumstances.[24] Thus, plaintiffs' attempts to scrap the March 2008 Agreement and return to federal court fail for the independent reason of failure of proof of changed financial circumstances, which is the only ground identified by plaintiffs' counsel under which revisiting, modifying or suspending the March 2008 Agreement might be appropriate.

>    ### D.    *Conclusion.*

For all of the foregoing reasons, it is the opinion of this Court that Plaintiffs' Motion to Proceed with Claims in this Judicial Forum (doc. 111) is due to be, and the same hereby is, **denied**. This ruling derives from three principal conclusions. First, plaintiffs are not permitted to reargue their lack of mutual assent and unconscionability defenses to the arbitration agreement, years after this Court considered and rejected them and years after commencing arbitration proceedings. Second, plaintiffs are not entitled to a judicial forum on grounds of arbitrator intent, inasmuch as the arbitrator has never ordered, directed or found that this case should proceed to conclusion in this District Court. At most, the arbitrator stated that he could

---

[24]    Assuming they shared the 40% burden equally, the total arbitrator fees paid by each plaintiff amount to less than 7% of Grozav's income ($400/wk x 52 weeks x 2 years) and barely 2% of Scurtu's household income ($4840/month x 12 months x 2 years) during that period. So the cumulative weight of the arbitrator fees over the lifespan of the arbitration does not reasonably constitute a changed circumstance.

not proceed because of a fee-related conflict of interest created by plaintiffs' representation of inability to pay, and suggested that the parties work out a new fee arrangement (which they did not) or petition this Court for guidance (which they did). Third, plaintiffs are not entitled to exchange their arbitral forum for a judicial forum on grounds of inability to pay, inasmuch as they have failed to meet their burden of showing that continuing with the arbitration process would be so prohibitively expensive as to preclude the effective vindication of their rights and have failed to identify any legitimate basis for not complying with their fee agreement.

## III.    Defendants' Motion to Dismiss.

Contemporaneously with Plaintiffs' Motion to Proceed with Claims in this Judicial Forum, defendants filed a Motion to Dismiss with Prejudice (doc. 112). Defendants' contention is that plaintiffs' conduct amounts to a breach of their initial arbitration agreements with HCMS and Wendco, as well as their March 2008 Agreement concerning payment of arbitration fees. In support of their Motion, defendants indicate that they have been unable to locate any legal authority adjudicating this precise scenario, but that their position is that this Court "has wide discretion to fashion an applicable remedy," whether that remedy be withdrawal of the reference to the arbitrator or dismissal of plaintiffs' claims. (Doc. 112, at 7.)[25]

---

[25]    Plaintiffs have filed a Motion to Strike Defendants' Motion to Dismiss (doc. 115) on the theory that defendants violated this Court's Order (doc. 109) dated April 19, 2010. The April 19 Order provided, in relevant part, that "the parties are **ordered**, on or before **May 10, 2010**, to file a joint report reflecting how they propose to proceed in this case. … If the parties reach agreement on a proposed course of action, their joint report should so specify. To the extent that they disagree, any party wishing for this Court to take any action is **ordered** to file a motion, supported by legal authority as appropriate, on or before the **May 10, 2010** deadline." (Doc. 109, at 2.) Plaintiffs' Motion to Strike emphasizes that defendants' counsel did not participate in a conference call with plaintiffs' counsel about the joint report requirement, prompting plaintiffs' counsel to file a unilateral report on May 10. Plaintiffs cast defense counsel's omission in this regard as "ignoring" the April 19 Order, and warranting that their Motion to Dismiss be stricken. The Court does not agree. To be sure, the April 19 Order instructed the parties to prepare a "joint report," and they did not do so because of defendants' nonparticipation. That fact is, on its face, troubling and, under different circumstances, might warrant sanctions. But not here, not once all of the relevant facts are considered. The purpose of the joint report requirement was to enable the Court to receive input from both sides as to how this case should proceed in light of the stalemate caused by the arbitrator's fee-related conflict of interest. Defendants substantially complied with the April 19 Order by filing their Motion to Dismiss on the May 10 deadline, thereby making their position on the proper course of action patently clear on the same day that their joint report was due. Thus, defendants provided all of (Continued)

The reasoning of Defendants' Motion to Dismiss is straightforward, and dovetails neatly with issues the Court has already addressed *supra* in the context of Plaintiffs' Motion to Proceed in this Forum. Defendants rely on undisputed facts that plaintiffs agreed to arbitrate their claims, promised to pay 40% of the arbitrator's fees, and then abruptly derailed the arbitration process by pronouncing their unwillingness to pay "the small amount of extra arbitration fees that would be required for the arbitrator to decide the pending motions for summary judgment" (doc. 112, at 12). According to defendants, because Scurtu and Grozav failed to consummate their agreed-upon arbitration duties, their claims should be dismissed with prejudice. Plaintiffs oppose the Motion to Dismiss for reasons already presented in their Motion to Proceed in this Forum, including contentions that they are not in breach of the fee agreement, that performance under that agreement is impossible, that the arbitrator has definitively ruled that plaintiffs cannot afford to continue funding the arbitration, and that plaintiffs are in fact unable to pay. These arguments and theories have been thoroughly explored in Section II of this Order, and no purpose would be served by reiterating the analysis here.

The upshot is this: Plaintiffs have not shown that arbitration has become so prohibitively expensive that it effectively precludes them from vindicating their rights in an arbitral forum. They have not shown that they are in compliance with the March 2008 Agreement, that they face changed financial circumstances, or that they cannot afford to pay the modest incremental sum necessary to replenish the arbitrator's retainer fund and enable him to decide the pending, ripe cross-motions for summary judgment. Plaintiffs have not shown that the arbitrator made an affirmative finding of inability to pay, or that he otherwise released them from either their arbitration agreements or the May 2008 Agreement on fees. On the basis of these determinations, the Court finds that plaintiffs' announcement in March 2010 that they would contribute no more arbitrator fees -- effectively stalling the arbitration by placing the arbitrator in an untenable conflict of interest -- constitutes a breach of their obligations under the arbitration agreement and the May 2008 Agreement.

---

the information demanded by the April 19 Order, albeit in a different format than a joint report. Under these circumstances, the Court cannot find that defendants flouted the April 19 Order or that sanctions are appropriate. The Motion to Strike is, accordingly, **denied**.

Notwithstanding plaintiffs' breach, the Court is of the opinion that Defendants' Motion to Dismiss is premature. The breach can be cured, with no associated prejudice or harm to HCMS and Wendco, if Scurtu and Gorzav now pay their promised $1,332 contribution to the arbitrator's retainer fund, thereby enabling the arbitration to move forward and the summary judgment process to advance to conclusion. No bridges have been burned with the arbitrator; to the contrary, he has reaffirmed his willingness to resume his duties upon eradication of the conflict of interest created by plaintiffs' cessation of fee contributions.[26] Because plaintiffs' non-compliance with their agreements can be corrected, it is only fair that they be given a reasonable opportunity to do so. On that basis, Defendants' Motion to Dismiss (doc. 112) is **denied**, without prejudice to defendants' ability to renew such motion if plaintiffs fail to cure within the timeframe provided below.

## IV.    Conclusion.

For all of the foregoing reasons, Plaintiffs' Motion to Proceed with Claims in this Judicial Forum (doc. 111), Defendants' Motion to Dismiss with Prejudice (doc. 112) and Plaintiffs' Motion to Strike (doc. 115) are all **denied**. The referral to the arbitrator remains in place, and defendants are **ordered** to continue filing monthly status reports, on or before the **third Friday of each month**, reflecting the status of the arbitration proceedings.

It is further **ordered** as follows:  Plaintiffs must make their contractually required payment of **$1,332.00** to the arbitrator's retainer fund no later than **August 26, 2010**. If they do not do so for any reason, then defendants are authorized to file a renewed motion to dismiss in this District Court, reflecting that plaintiffs have failed to cure the breach identified in this Order despite a reasonable opportunity to do so. This Court will take any such motion under submission on an expedited basis.[27]

---

[26]    Besides, from a purely pragmatic standpoint, it would be far more efficient for this arbitrator (who has lived with this dispute and these parties for a period of years) to take up and resolve the motions for summary judgment than for someone else to do so.

[27]    As additional guidance to the parties if plaintiffs timely make the requisite payment, the Court states as follows:  It is possible that the arbitrator's rulings on the cross-motions for summary judgment will resolve this dispute in its entirety and that there will be no further need for party contributions to the arbitrator's retainer fund beyond that point. Of course, it is also possible that all or some portion of this matter will survive summary judgment and will need to proceed to final hearing, yielding the specter of additional arbitrator fees and retainer (Continued)

DONE and ORDERED this 27th day of July, 2010.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE

---

fund contributions.  If such payments become necessary, and if plaintiffs believe that because of changed financial circumstances they are unable to make those contributions in accordance with the legal standards specified herein, it is expected that counsel for both sides will set aside their personal differences and work together *in good faith* to renegotiate their May 2008 Agreement on fees to accommodate plaintiffs' circumstances.  If plaintiffs' claims of inability to pay are valid and provable, and if defendants insist on playing hardball by refusing to make the necessary accommodations to allow the arbitration to proceed, on proper motion from plaintiffs this Court may find that defendants have effectively frustrated the arbitration process (by trying to force plaintiffs to make fee payments they cannot afford, and again creating a conflict of interest for the arbitrator) and that plaintiffs are entitled to proceed to trial in this forum on a *Smallwood* waiver theory.  Thus, the parties should not construe this Order's determination that plaintiffs have failed to show inability to pay the modest fees needed to allow the arbitration process to advance at this time as a be-all, end-all pronouncement as to future developments.  It is not.  If the case survives summary judgment, and if plaintiffs can document both the likely amount of arbitrator fees needed to conduct the trial and their inability to make their agreed-upon 40% contribution to those fees, defendants may face a choice of either (i) remaining in arbitration and agreeing to fund all or part of the difference as a compromise to avert conflicts of interest for the arbitrator, or (ii) proceeding to trial in federal court should they overplay their hand by insisting that Scurtu and Grozav pay additional arbitrator fees that they cannot afford under the legal standards set forth herein.