# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| LINA SCURTU, *et seq.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | CIVIL ACTION 07-0410-WS-B |
| ) | |
| HOSPITALITY AND CATERING ) | |
| MANAGEMENT SERVICES, *et al.*, ) | |
| ) | |
| Defendants. ) | |

## ORDER

This matter comes before the Court on defendants' Renewed Motion to Dismiss (doc. 125). The Motion has been briefed and is ripe for disposition.

**I.     Relevant Background.**

The undersigned is hard-pressed to recall any matter referred to arbitration that has consumed more judicial resources post-referral – and while still pending before the arbitrator – than this case has done. Indeed, the Court has written extensively to the relevant factual and procedural posture of this action, and particularly the conundrum that the parties have created for themselves, in a series of Orders dated July 27, 2010 (doc. 118), October 18, 2010 (doc. 124), and November 3, 2010 (doc. 129).

The abridged version of the now-tortured history of this case is this: Plaintiffs, Lina Scurtu and Cornelia Grozav, are former residents of the Republic of Moldova who claim that defendants, Hospitality and Catering Management Services and Wendco Corp., engaged in fraudulent conduct and breached contractual promises in connection with a management training program through which plaintiffs relocated to the United States. Back in October 2007, the Court granted defendants' motion to compel arbitration and referred plaintiffs' claims to an arbitrator pursuant to valid, enforceable arbitration agreements. Incredibly, arbitration still has not concluded, and cross-motions for summary judgment have been pending before the arbitrator for approximately one year. As the Court understands it, the arbitrator is not considering those motions at this time because plaintiffs are in arrears in paying their agreed-upon portion of the

arbitrator's fees, which are 40% of the total.[1]  When plaintiffs stopped paying their share (and defendants declined to cover the difference to facilitate prompt continuation of arbitration), the arbitrator understandably ceased work.  Not only was he concerned about being compensated for his labors, but also he perceived a substantial risk of a conflict of interest if he moved forward despite the fee asymmetries.  Arbitral proceedings have been a standstill ever since.[2]

Both plaintiffs and defendants independently appealed to this Court last May for help in breaking the stalemate.  For their part, plaintiffs urged the undersigned to terminate the arbitration, vacate the October 2007 order referring the matter to arbitration, and set a trial date in federal court.  Contemporaneously, defendants asked the Court to dismiss this action in its entirety because plaintiffs had failed to perform agreed-upon arbitration duties (*i.e.*, they did not pay their 40% share after promising to do so).  On July 27, 2010, the undersigned entered a 23-page Order (doc. 118) addressing all of these issues.  That Order denied plaintiffs' request to vacate the referral, finding that the arbitration agreements in question had previously been deemed valid and enforceable, the arbitrator had expressed no intent that the arbitration be terminated, and plaintiffs had failed to meet their burden of establishing that continuing in arbitration amounted to an economic impossibility or was prohibitively expensive for them.

With respect to defendants' motion to dismiss, the July 27 Order concluded, based on plaintiffs' own evidence, that plaintiffs presently "were responsible for paying an additional $1,332.00 (or $666 each) at that time to the restore the retainer fund to its agreed-upon level." (Doc. 118, at 14.)  Importantly, plaintiffs proffered no evidence and made no arguments at that time that they owed anything more than $1,332 to the arbitrator, or that any immediate payment

---

[1] This arbitration fee allocation was established not by the underlying arbitration agreements, but by agreement of counsel for both sides in March 2008, some five months after referral to arbitration.  At the time, plaintiffs' counsel informed opposing counsel that he "cannot in good faith argue that my clients cannot afford" to pay that fraction of fees.  (Doc. 115, Exh. E.)  To date, the parties do not appear ever to have modified this arrangement, and plaintiffs' failure (or, according to them, inability) to hold up their end of the bargain is a root cause of the derailment of the arbitration.

[2] Although plaintiffs' counsel has made representations to the arbitrator that his clients are unable to pay the arbitrator's fees, at no time has the arbitrator made any finding concerning their ability to pay; rather, both the arbitrator and the parties appear to have deliberately deferred all such issues to this Court.

above and beyond that amount was needed to get the arbitration process back on track. (*Id.* at 17.) Moreover, the July 27 Order noted, plaintiffs' evidence established that plaintiff Scurtu's household income was more than $4,800 per month, of which more than $2,100 appeared to be discretionary (*id.* at 15), and that plaintiff Grozav presently had $700 in unallocated, uncommitted funds in a bank account (*id.* at 14). Based on these facts, including plaintiffs' failure to show that arbitration had become prohibitively expensive for them or that they were incapable of paying the modest sums necessary to resume the arbitral proceedings, the July 27 Order concluded that "plaintiffs' announcement in March 2010 that they would contribute no more arbitrator fees … constitutes a breach of their obligations under the arbitration agreement and the May 2008 Agreement." (*Id.* at 21.) Rather than granting defendants' motion to dismiss on the basis of these findings, the Court in its discretion afforded plaintiffs an opportunity to cure their breach. On that basis, the July 27 Order included the following provision: "It is further **ordered** as follows: Plaintiffs must make their contractually required payment of **$1,332.00** to the arbitrator's retainer fund no later than **August 26, 2010**." (*Id.* at 22.)

By all appearances, plaintiffs simply ignored the July 27 Order. At no time did they request relief from the terms of that Order. Nor did they pay the arbitrator <u>anything</u> by the August 26 deadline, much less the specific sum they had been directed to pay. Indeed, status reports (docs. 119, 121) filed in August and September 2010, indicated that plaintiffs had not paid another dime to the arbitrator in the interim. Plaintiffs thus failed to make even a token effort to comply in a timely manner with the clear terms of the July 27 Order.

In the October 2010 Status Report, plaintiffs indicated that they had chosen to pay the arbitrator a total of $200 per month towards their retainer obligations. (Doc. 123.) Of course, that $200 figure was neither selected nor approved by this Court; rather, plaintiffs apparently unilaterally decided that such a payment plan was more to their liking than the court-ordered $1,332 lump-sum payment, so that is what they did. Subsequent status reports confirm that plaintiffs have continued to pay $200 per month in arbitrator fees, from October 2010 through January 2011. (*See* docs. 132, 133, 134.)

Defendants have now filed a Renewed Motion to Dismiss (doc. 125) for the simple, straightforward reason that this Court ordered plaintiffs to pay $1,332 to the arbitrator by August 26, 2010, yet plaintiffs defied the July 27 Order by instead paying only much smaller sums in

amounts that they unilaterally deemed appropriate, and even then did not commence making such payments until long after the court-ordered deadline had expired.

## II.     Analysis.

Plaintiffs' memorandum (doc. 130) filed in opposition to the Renewed Motion to Dismiss offers two substantial arguments, to-wit: (1) that the Court lacks jurisdiction to decide the Motion; and (2) that the Motion (and the July 27 Order on which it is premised) rests on inaccurate statements of fact. Each of these issues will be addressed in turn.[3]

### A.     *The Court's Jurisdiction to Hear Defendants' Motion.*

Plaintiffs maintain that this Court lacks jurisdiction to hear the Renewed Motion to Dismiss because jurisdiction vests exclusively with the arbitrator until such time as "preliminary proceedings are completed by the arbitrator." (Doc. 130, at 2.) The Court disagrees for three reasons.

First, it is critically important to remember the context in which the July 27 Order was entered. The undersigned was not actively seeking an opportunity to become entangled in the arbitration proceedings. Given the demands of the active civil docket, writing extensively on multiple occasions to an ongoing arbitration in which counsel for both sides have been at loggerheads every step of the way does not rank highly on any judicial wish list. More broadly,

---

[3]     Additionally, plaintiffs raise a pair of other objections to the Renewed Motion to Dismiss that can be quickly dispatched. First, plaintiffs argue that the Motion contravenes Local Rule 7.1, which provides that any Rule 12(b) motion must be supported by a brief. This contention is meritless because (i) the Motion was not filed pursuant to Rule 12(b), but rather seeks dismissal as a sanction for plaintiffs' noncompliance with their arbitration duties and court orders; and (ii) Local Rule 7.1 is satisfied by incorporated memoranda, and defendants' Motion contains sufficient elaboration and detail to satisfy the "brief" requirement in any event. Second, in a reprise of the kind of open hostility and lack of professional courtesy that has dogged this matter for years, plaintiffs' counsel accuses defendants' counsel of filing the Renewed Motion to Dismiss in bad faith and in violation of Rule 11. No viable Rule 11 issue is presented here. There is absolutely no reason to believe that defendants filed their Renewed Motion to Dismiss for any improper purpose, or for any reason other than plaintiffs' disregard of (and refusal to abide by) the clear directives of the July 27 Order. Contrary to plaintiffs' memorandum, nothing in the October 2010 status report reflects any promise by defendants not to seek dismissal of this action on that basis. Even if defendants changed their minds between the filing of the October 2010 status report and the filing of the Renewed Motion to Dismiss six days later, such a change of heart is not symptomatic of the sort of bad faith required to establish a violation of Rule 11, especially when the Motion is predicated on circumstances of obvious noncompliance by plaintiffs with a court order.

the Court is fully cognizant of the admonition that "courts are not to reach out and micromanage the procedural aspects of arbitration." *Merrill Lynch, Pierce, Fenner & Smith v. Barchman*, 916 F. Supp. 845, 849 (N.D. Ill. 1996). In entering the July 27 Order, the undersigned acted with no small measure of reluctance, and did so only pursuant to its express understanding that "(a) both sides have asked this Court to resolve the legal and procedural quagmire in which they find themselves, and (b) the arbitrator himself has declined to resolve those issues but instead deferred to this Court." (Doc. 118, at 10 n.13.) Although plaintiffs and defendants alike petitioned this Court to resolve their disputes on matters such as whether plaintiffs were in breach of the fee agreement, plaintiffs suddenly reversed course when the July 27 Order yielded an answer that was not to their liking. Frankly, it smacks of duplicity, and is neither fair nor reasonable, for a litigant to request a court ruling on a particular issue, and then challenge the court's authority to do so upon receiving an unfavorable result. A litigant cannot have it both ways. *See generally Estate of Amergi ex rel. Amergi v. Palestinian Authority*, 611 F.3d 1350, 1367 (11th Cir. 2010) ("[i]t is a cardinal rule of appellate review that a party may not challenge as error a ruling or other trial proceeding invited by that party") (citation omitted). Yet this is precisely what plaintiffs are endeavoring to achieve here. They will not be rewarded for doubling back on themselves based on the perceived expediencies of the moment.

Second, although plaintiffs cite to the Order (doc. 124) dated October 18, 2010, they wholly ignore the authorities identified therein recognizing this Court's authority to take appropriate action to ensure that parties fulfill their arbitration commitment in a reasonably prompt and diligent manner. *See Martens v. Thomann*, 273 F.3d 159, 179 n.14 (2nd Cir. 2001) ("we note that those courts to have addressed the issue have held that a court which stays an action pending arbitration nevertheless maintains jurisdiction to regulate the parties' conduct by issuing sanctions, including dismissal for failure to prosecute"); *LaPrade v. Kidder Peabody & Co.*, 146 F.3d 899, 902-03 (D.C. Cir. 1998) (affirming district court's imposition of sanctions against party engaged in dilatory tactics in arbitration proceedings previously ordered by that court, reasoning that "[c]learly, the district court had jurisdiction to address this situation" because "the Arbitration Act did not divest it of jurisdiction to ensure that the parties adhered to its previous order"); *Perry v. Norwest Financial Alabama, Inc.*, 1998 WL 964987, *1 (S.D. Ala. Dec. 9, 1998) (explaining that, after staying case for arbitration, district court "continues to have certain powers over the parties and their arbitral proceeding … [and] can impose sanctions on the

parties for employing dilatory tactics which frustrate the arbitral process").[4] Those decisions – which plaintiffs have neither distinguished nor even acknowledged – expressly recognize district courts' power to enter appropriate orders and sanctions where, as here, the parties' inexcusably dilatory conduct has caused the arbitration proceedings to drag on for more than three years, with no end in sight.[5]

Third, with these procedural maneuverings, plaintiffs obscure a fundamental point. The sole basis for the Renewed Motion to Dismiss is plaintiffs' failure to comply with the unambiguous terms of the July 27 Order. We are here only because plaintiffs, for whatever reason, did not abide by a proper order entered by this Court directing them to pay $1,332.00 to the arbitrator's retainer fund on or before August 26, 2010. The Renewed Motion to Dismiss asks the Court to impose the sanction of dismissal on plaintiffs for their disregard of the July 27 Order. Whatever else can be said, this Court is empowered to enforce its own orders. Indeed, the law in this Circuit is clear that "[a] district court need not tolerate defiance of reasonable orders." *Equity Lifestyle Properties, Inc. v. Florida Mowing and Landscape Service, Inc.*, 556 F.3d 1232, 1240 (11th Cir. 2009); *see also In re Evergreen Sec., Ltd.*, 570 F.3d 1257, 1263 (11th Cir. 2009) ("Federal courts … possess inherent authority to impose sanctions against attorneys and their clients."); *In re Sunshine Jr. Stores, Inc.*, 456 F.3d 1291, 1304 (11th Cir. 2006)

---

[4] *See also Perpetual Securities, Inc. v. Tang*, 290 F.3d 132, 141 (2nd Cir. 2002) (in arbitration context, "[a]lthough the district court lacked jurisdiction to decide the merits of the underlying action, it retained the power to determine collateral issues, such as the appropriateness of sanctions"); *ATAC Corp. v. Arthur Treacher's, Inc.*, 280 F.3d 1091, 1102 (6th Cir. 2002) ("ample precedent indicates that a district court retains jurisdiction over collateral matters that do not require addressing the legal merits of the case" after staying it pending arbitration, such that "courts have imposed sanctions after staying a case pending arbitration").

[5] Plaintiffs admit that "[t]his Court's jurisdiction is generally limited only to enforcing the obligations of arbitration." (Doc. 130, at 3.) Of course, that is precisely what this Court is doing. Plaintiffs' foot-dragging over financial matters has frustrated the entire purpose of arbitration, effectively holding the arbitration proceeding hostage and silencing the arbitrator out of fear that he will be perceived to have a conflict of interest if he addresses these issues directly. Without judicial intervention, there is substantial reason to question whether the underlying arbitration would ever conclude, or whether the parties would simply drag it out in perpetuity. Ultimately, the Court's rulings in the July 27 Order and today are designed to enforce the parties' arbitration obligations established by the October 2007 Order. Such is squarely within a court's purview.

("Federal courts have the inherent power to impose sanctions on parties, lawyers, or both."). Viewed through this prism, plaintiffs' jurisdiction objection is baseless, as is their bewildering suggestion that the arbitrator – and not this Court – must be tasked in the first instance with enforcing a federal court order and deciding what, if any, sanctions are warranted for plaintiffs' violation of same.

### B. The Propriety of Sanctions for Violation of the July 27 Order.

The situation in which plaintiffs have placed themselves is simple. Last summer, they suddenly stopped paying the arbitrator and asked this Court to make a finding that they were financially unable to proceed with arbitration. The July 27 Order ruled against plaintiffs, finding (based on evidence they submitted) that plaintiffs were capable of making the necessary payment to replenish the arbitrator's retainer fund, and ordering them to make such payment in the sum of $1,332.00 by no later than August 26, 2010. Yet plaintiffs did not make the payment. They did not seek reconsideration of the July 27 Order. Despite actual knowledge of the Order, they chose to ignore it, apparently because they felt the order "was based upon an incorrect premise and conclusion of fact." (Doc. 130, at 4.) But our system of justice does not allow parties or their attorneys to decide for themselves whether to abide by a court order, and to follow only those orders with which they agree. *See, e.g., Wallace v. UAW Local 1639*, 2008 WL 2705382, *4 (S.D. Ala. July 9, 2008) (observing that "a federal court litigant does not have the luxury of picking and choosing which court orders she wants to abide by, and cavalierly disregarding the others"); *see generally Glassroth v. Moore*, 335 F.3d 1282, 1303 (11th Cir. 2003) ("The rule of law does require that every person obey judicial orders when all available means of appealing them have been exhausted.").

When litigants, like Grozav and Scurtu here, take it upon themselves not to abide by a federal court order with which they disagree, they expose themselves to the threat of sanctions, up to and including dismissal of their lawsuit. *See* Rule 41(b), Fed.R.Civ.P. ("If the plaintiff fails to prosecute or to comply with … a court order, a defendant may move to dismiss the action or any claim against it."); *Equity Lifestyle*, 556 F.3d at 1240 ("The court may dismiss a claim if the plaintiff fails to prosecute it or comply with a court order."); *Gratton v. Great American*

*Communications*, 178 F.3d 1373, 1374 (11th Cir. 1999) (observing that Rule 41(b) expressly "authorizes a district court to dismiss a complaint for … failure to comply with a court order").[6]

To excuse their noncompliance with the July 27 Order, plaintiffs offer two justifications. First, they say, the July 27 Order "was based on incorrect information regarding the financial requirements of continuing arbitration." (Doc. 130, at 5.) This excuse is unsatisfactory. As noted *supra*, a party cannot ignore an unequivocal judicial directive without consequence merely because it thinks the court got it wrong. Besides, the July 27 Order was based on financial information furnished by plaintiffs. If that Order was mistaken as to the financial circumstances, it is only because of plaintiffs' failure to provide the Court with correct, complete information in briefing the underlying motions.[7]

---

[6] It is true, of course, that where a federal court imposes sanctions pursuant to its inherent powers, those sanctions must be predicated on a finding of bad faith, such as where a party "delay[s] or disrupt[s] the litigation or hamper[s] enforcement of a court order." *Sunshine*, 456 F.3d at 1304 (citations omitted); *see also Peer v. Lewis*, 606 F.3d 1306, 1316 (11th Cir. 2010) ("The key to unlocking a court's inherent power is a finding of bad faith.") (citation omitted); *In re Walker*, 532 F.3d 1304, 1309 (11th Cir. 2008) ("A party also demonstrates bad faith by delaying or disrupting the litigation or hampering enforcement of a court order.") (citation omitted); *see generally Phipps v. Blakeney*, 8 F.3d 788, 790 (11th Cir. 1993) (sanction of dismissal "may be appropriate when a plaintiff's recalcitrance is due to wilfulness, bad faith or fault"). The requisite bad faith appears to be present here. By ignoring the July 27 Order, plaintiffs delayed and disrupted the litigation, and obviously hampered the Order's enforcement by forcing defendants to file their Renewed Motion to Dismiss to attempt to compel plaintiffs to do that which they were unequivocally ordered to do last July.

[7] Taking the analysis one level deeper, plaintiffs' contention that the July 27 Order misapprehended "the financial requirements of continuing arbitration" (doc. 130, at 5) is simply wrong. Plaintiffs' position is that the July 27 Order misunderstood that a single payment of $1,332 would be sufficient to conclude the arbitration, when in fact plaintiffs believe it would cost much more than that. (Doc. 130, at 4-5.) But the text of the July 27 Order specifically refutes this spin. On its face, the July 27 Order was concerned with how much money was necessary to enable the arbitrator to resume work, and understood from plaintiffs' own evidence that this sum was $1,332. That Order included the following passage: "[I]t bears emphasis that the only arbitrator fee obligation plaintiffs face at this time consists of the arbitrator's request that they pay $1,332 in the aggregate to replenish his retainer fund to its agreed-upon baseline level. Plaintiffs pulled the plug on the arbitration by telling the arbitrator they could not afford to make those payments …. The question presented at this time is, at its core, not whether plaintiffs are financially able to fund arbitrator fees in perpetuity to the tune of untold thousands of dollars, but whether plaintiffs can afford to pay $666 each in fees …." (Doc. 118, at 17.) In other words, the July 27 Order focused on the $1,332 not because the Court was operating under the belief that this amount would cover the remainder of arbitration, but because plaintiffs' failure/refusal
(Continued)

Second, plaintiffs state that "compliance with the specific monetary directive of the Court within its time frame was an impossibility." (Doc. 130, at 5.) In other words, plaintiffs say they did not comply with the July 27 Order because they were financially incapable of doing so.[8] Leaving aside the unanswered question of why plaintiffs did not alert the Court to this "impossibility" before the deadline established by the July 27 Order, this explanation is not adequately supported at this time. Simply put, plaintiffs have not presented organized, cogent proof of their financial ability to pay that might excuse their noncompliance. At best, they point to an undifferentiated mass of 100+ pages of exhibits they attached to their "Report to the Court" (doc. 127) back in October. Plaintiffs do not formulate any specific arguments or contentions based on those exhibits. They do not cite to particular pages and explain how particular facts therein support their allegations of poverty. They do not present any narrative or factual discussion that might weave these exhibits together in a way that might tell a story of indigence sufficient to excuse their failure to abide by the July 27 Order. Instead, plaintiffs in essence say, "Here are our documents, Judge. You figure it out." But courts do not make a party's arguments for it and do not scour uncited, aggregated exhibits to develop a persuasive factual recitation that the party itself neglected to articulate.[9]

---

to pay that amount was the precipitating event that caused the arbitration to stall and sent both parties scrambling to federal court for relief. Plaintiffs have made no showing that payment of $1,332 would be insufficient to enable the arbitrator to resume work. So the "incorrect premise" on which plaintiffs harp as an excuse for their noncompliance with the July 27 Order is actually a red herring totally divorced from the reasoning and conclusions of that ruling.

[8] An obvious threshold problem with this contention is that the July 27 Order examined in detail plaintiffs' ability to pay, and made an express determination that they were capable of meeting that $1,332 obligation. Plaintiffs' impossibility assertion conveniently ignores those express findings, which were derived from plaintiffs' own evidentiary materials.

[9] Plaintiffs' invitation to do just that is perplexing, given this Court's previous, unambiguous admonition that it would not. In an Order (doc. 129) entered on November 3, 2010, the undersigned explained that "[t]he Court will not *sua sponte* cull through the 100+ pages of exhibits and devise arguments for how this evidence may advance plaintiffs' position on the Motion to Dismiss, or any other motion or request (whether filed or unfiled)." (Doc. 129, at 2.) Plaintiffs apparently did not take this statement seriously, as their brief filed the very next day urged the Court to review these same exhibits in the aggregate because those undifferentiated documents "reflected the very limited nature of the Plaintiffs' assets." (Doc. 130, at 5 n.3.) Plaintiffs must organize and analyze their exhibits, and present cogent, detailed (Continued)

**III. Conclusion.**

Based on this entirely deficient showing of ability to pay, plaintiffs are veering perilously close to having their Complaint dismissed for bad-faith noncompliance with the July 27 Order, pursuant to the inherent powers of this Court. Nonetheless, in its discretion, and to avoid possible inequities, the Court will afford plaintiffs one final attempt to establish their inability to pay. Accordingly, plaintiffs are **ordered**, on or before **March 3, 2011**, to file a supplemental factual and legal submission demonstrating their purported inability to pay the sum of $1,332 within the timeframe directed by the July 27 Order.

Given the glaring infirmities in plaintiffs' previous submissions, the Court wishes to be very clear concerning what is required for plaintiffs to avoid the sanction of dismissal at this time. For plaintiffs' showing to be deemed sufficient, it must not be conclusory. It must neither trade in generalities, nor refer the Court to a raft of undifferentiated financial records with a wave of hand. What the Court expects is, at a minimum, the following: (i) financial affidavits executed by each plaintiff documenting her current <u>household</u> income, expenses, assets and liabilities, with each broken down into specific line items;[10] (ii) an affidavit or declaration by

---

arguments based on the contents of those exhibits. They may not shift this burden to the Court by dumping a mass of records into the court file.

[10]    Plaintiffs have resisted consideration of financial data pertaining to plaintiff Scurtu's husband because "he is in an undisclosed combat zone in the Middle East and not a party to this action." (Doc. 130, at 5 n.3.) This conclusory, unsupported argument is unhelpful. In a variety of analogous contexts, courts routinely look to household income and assets in gauging ability to pay, regardless of whether the plaintiff's spouse is or is not a party. *See, e.g., In re Burr*, 344 B.R. 234, 237 (Bankr. W.D.N.Y. 2006) ("The debtor's ability to make installment payments will depend upon not just her own income, but upon the income and expenses of the entire household unit. Those who share the benefits of a common household must also expect to contribute to its burdens."); *Fridman v. City of New York*, 195 F. Supp.2d 534, 537 (S.D.N.Y. 2002) (in IFP context, "a court may consider the resources that the applicant has or 'can get' from those who ordinarily provide the applicant with the 'necessities of life'") (citations omitted); *Zhu v. Countrywide Realty Co.*, 148 F. Supp.2d 1154, 1156 (D. Kan. 2001) ("In a number of cases, courts have found that the income and assets of close family members are relevant to a determination of indigency …."); *Monti v. McKeon*, 600 F. Supp. 112, 114 (D. Conn. 1984) ("in ruling on motions to proceed *in forma pauperis*, other courts have considered the income of interested persons, such as spouses and parents, in evaluating the funds available to the movant"); *In re Bryant*, 2009 WL 290478, *2 (Bankr. N.D. Iowa Feb. 3, 2009) ("The Court may include the income earned by the Debtor's spouse when determining Debtor's ability (Continued)

each plaintiff documenting how, if at all, her household financial circumstances have changed since the entry of the July 27 Order; (iii) an affidavit or declaration showing how much plaintiffs have paid the arbitrator since the inception of this arbitration, with specific amounts and dates of payment, through the present; (iv) back-up documentation, appropriately lettered or tabbed with exhibit numbers or stickers, corresponding to particular factual allegations set forth in the foregoing affidavits or declarations; and (v) a memorandum by plaintiffs' counsel explaining why, based on the specific facts presented in these materials, plaintiffs could not afford to pay a single dollar of the $1,332 ordered by the July 27 Order within the time frame provided.

Alternatively, plaintiffs may satisfy their obligations under this Order by making a sufficient payment to the arbitrator to enable the arbitral proceedings to resume (in whatever amount the arbitrator deems sufficient to resume work on summary judgment, and with or without agreed-upon contributions from defendants), and by filing proof to that effect on or before the **March 3, 2011** deadline.

Because of the inordinate delays that have already transpired, and because the issue here is at its core whether dismissal is an appropriate sanction to plaintiffs for noncompliance with the July 27 Order, the undersigned does not require briefing from defendants in evaluating the sufficiency of plaintiffs' submission. Accordingly, no other briefing is authorized at this time.

DONE and ORDERED this 11th day of February, 2011.

s/ WILLIAM H. STEELE<br>CHIEF UNITED STATES DISTRICT JUDGE

---

to pay."); *Dycus v. Astrue*, 2009 WL 47497, *2 (S.D. Ala. Jan. 7, 2009) ("The question … is whether the litigant is 'unable to pay' the costs, and the answer has consistently depended in part on [the] litigant's actual ability to get funds from a spouse, a parent, an adult sibling, or other next friend.") (citations omitted); *In re Coup*, 2008 WL 2388114, *4 (Bankr. N.D. Ohio June 6, 2008) ("courts have generally concluded that a non-filing spouse's income is also relevant to the determination of a debtor spouse's ability to pay"). Thus, the baseline rule is that plaintiffs' husbands' income and assets are properly considered in assessing their ability to pay. To the extent that plaintiffs maintain otherwise, they must present specific, detailed evidence and/or legal research demonstrating either that plaintiffs' husbands' earnings are not available to them and/or that such resources are not properly considered as a matter of law. Conclusory, sleight-of-hand statements such as those found in plaintiffs' previous submissions seeking to distance themselves from their husbands' earnings will not suffice.